In re Joseph M. BONFIGLIO,
Jr., Debtor–Appellant,

v.

HARKEMA ASSOCIATES, INC.,
Creditor–Appellee.

Civ. A. No. 94–71031.
Bankruptcy No. 93–4293.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 24, 1994.

Donald F. Cadotte, Bloomfield Hills, MI, for Joseph M. Bonfiglio, Jr.

Paul H. Steinberg, Steinberg & Shapiro, Troy, MI, for Harkema Associates, Inc.

### ORDER GRANTING DEBTOR'S APPEAL

GADOLA, District Judge.

On January 24, 1994, the bankruptcy court entered judgment in favor of plaintiff, excepting from discharge debt owed to plaintiff. On March 7, 1994, the bankruptcy court entered an order affixing plaintiff's damages at $69,655.46. Debtor instituted this appeal March 17, 1994 and filed a brief on appeal April 26, 1994. Plaintiff filed a response to debtor's appeal May 11, 1994. Debtor filed a reply brief May 18, 1994.

### I. Factual Background

On July 31, 1990, Debtor Joseph M. Bonfiglio, Jr. ("Debtor"), in his capacity as President of St. Anne Group, entered into an agreement to purchase the business owned by plaintiff Harkema Associates, Inc. ("Seller"), an interior design showroom located in the Michigan Design Center ("MDC") in Troy, Michigan.[1] The Purchase Agreement provided that

> 7. The purchase price shall be Eighty–Five Thousand ($85,000.00) and the consideration for the covenant not to compete shall be Ten Thousand Dollars ($10,000), payable as follows:
>
>> A. A refundable deposit of Five Thousand Dollars ($5,000.00) shall be paid at the time this Agreement is executed, ...; and
>>
>> B. The sum of Twenty Thousand Dollars ($20,000.00) shall be paid on the date of closing, ...; and

---

1. The parties are in disagreement as to whether Debtor also entered into the Purchase and Security Agreements in his personal capacity. Because this court finds, *infra,* that the debt owed plaintiff is dischargeable, the court will not address this issue.

C. Also to be delivered on the date of closing by Buyer will be a promissory note to Seller in the amount of Seventy Thousand Dollars ($70,000.00) at ten percent (10%) annual interest from August 1, 1990. First payment is to be made October 1, 1990, and all payments shall be due on the first of each successive month thereafter.

\* \* \* \* \* \*

E. The parties agree that the purchase price shall be allocated as follows: (1) Equipment and Fixtures—$35,000.00; (2) Inventory—$50,000.00. The consideration for the covenant not to compete is $10,000.

8. Seller hereby warrants and represents to Buyer that:

\* \* \* \* \* \*

B. The inventory on hand at closing shall have a value at cost, net of all liens and encumbrances, of Sixty Thousand Dollars ($60,000.00) or more.

Purchase Agreement at 3–5. Pursuant to paragraph 7.C. of the Purchase Agreement, the parties entered into a Security Agreement on July 31, 1990 for the $70,000.00 balance on the purchase price. The Security Agreement provided, *inter alia*, that

3. The Debtor may sell, contract to sell, lease, encumber or otherwise dispose of the collateral or any interest in it under this Security Agreement, provided however, the Secured Party shall have a floating secured interest *on all other equipment and inventory acquired by the Debtor* and used in its principal place of business until said obligation evidenced by the Promissory Note is paid in full.

Security Agreement at 2 (emphasis added). Attached to the Security Agreement is a listing of inventory and equipment which sets forth both the retail price to the interior designers [2] and the price that was paid by Seller to the manufacturer of the item. The parties created this inventory and equipment list together on August 8, 1990, agreeing

upon the items and prices listed. According to Seller, the actual cost to Seller of the inventory, valued in the Purchase Agreement at $50,000.000, was $66,685.13; the total cost to Seller of the equipment and fixtures, valued in the Purchase Agreement, at $35,000.00, was $42,445.00.

The Purchase Agreement was conditioned upon, *inter alia*, the Debtor entering into a three-year lease of the showroom space directly with the landlord of the MDC, beginning August 1, 1990. On Debtor's behalf, Seller negotiated with the landlord of the MDC a rental rate that was approximately half the normal rental rate until such time as the landlord was able to rent half of the retail space to another showroom company. Debtor paid the rent in a timely fashion.

On April 1, 1994, Debtor was notified by the landlord of MDC that the other half of the showroom space had been rented and that Debtor had to clear out of those premises by April 10, 1991. On or about April 4 and 5, 1991, per Debtor's instructions, Debtor's employees conducted a sale of certain furniture items. The sale resulted in proceeds of approximately $15,000. These proceeds were retained by St. Anne Group: a portion was used to pay Debtor and his employees back wages for working in the store; other of the proceeds were used to pay miscellaneous bills and to purchase some new merchandise.

Debtor made only two payments, a total of approximately $1,944.00, toward the $70,000.00 security note that he had given to Seller pursuant to the Purchase Agreement. In the spring of 1991, following the April sale of certain of the showroom merchandise, Seller and Debtor met, together with their respective attorneys, to work out a deal whereby Debtor would be granted a six-month forbearance on the note payments owed to Seller.[3]

On September 26, 1991, Seller obtained an injunction from the Oakland County Circuit Court which prevented Debtor from continuing to operate the business and returned the

---

2. The showroom was open for sales only to interior designers and not to the general public.

3. The testimony established that business was slow due to the recession and had been equally slow prior to the sale of the business to Debtor.

business to Seller. On October 8, 1991, the parties went through the showroom and again created and agreed upon a listing of each item of inventory and equipment present in the showroom upon return of the business to Seller, and the retail price and wholesale cost of each item. The total indicated at the bottom of the list is $51,225.00.

On April 15, 1992, Debtor filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code. 11 U.S.C. § 701, *et seq.* Thereafter, Seller, Harkema Associates, Inc., filed an adversary proceeding against Debtor seeking revocation of Debtor's discharge pursuant to 11 U.S.C. §§ 523(a)(6) and 727(a)(3).

Section 727(a)(3) provides that discharge of a debt may not occur where

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3). The bankruptcy court denied Seller's claim under section 727(a)(3), finding that Seller had failed to demonstrate that Debtor had not properly maintained the records of the showroom business. Debtor-appellant therefore seeks no review of this decision of the bankruptcy court and the court's application of section 727(a)(3) need not be addressed by this court. The only issue this court need address is whether the bankruptcy court properly applied 11 U.S.C. § 523(a)(6) to this case.

## II. Standard of Review

██ A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard of review. *In re American Mariner Indust., Inc.*, 734 F.2d 426, 429 (9th

Cir.1984). A bankruptcy court's conclusions of law are reviewed *de novo. Id.*

## III. Analysis

Under 11 U.S.C. § 727, "[t]he court shall grant the debtor a discharge," unless an exception to discharge is applicable. Section 523(a) provides that

A discharge under section 727, ... of this title [11 U.S.C. § 727 ...] does not discharge an individual debtor from any debt—

$$* \quad * \quad * \quad * \quad * \quad *$$

(6) for willful and malicious injury by the debtor to another equity or to the property of another entity;

11 U.S.C. § 523(a)(6). A willful and malicious injury has been defined by the Sixth Circuit generally as "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse." *Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226, 1228 (6th Cir.1991).[4]

██ Seller claims that Debtor acted willfully and maliciously by the wrongful conversion in April 1991 of some of the assets of St. Anne Group. Seller claims that the sale of some of St. Anne Group's assets constituted conversion because the assets were subject to Seller's security interest. Seller, as the party seeking to establish an exception to discharge, bears the burden of proof. *Atassi v. McLaren,* 990 F.2d 850, 853 (6th Cir.1993). Seller must prove, by a preponderance of the evidence, all facts necessary to support a judgment of nondischargeability. *Grogen v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *cited in Atassi,* 990 F.2d at 853. Any doubts with respect to the evidence should be resolved in the debtor's favor. *Atassi,* 990 F.2d at 852.

██ The intentional tort of conversion meets the requirements of 11 U.S.C. § 523(a)(6) for nondischargeability by virtue of a "willful and malicious injury." *Vulcan*

---

4. In so doing, the Sixth Circuit rejected the stricter standard that willful and malicious requires an act with intent to cause injury. The Sixth Circuit held that "an injury to an entity or property may be malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will." *Id., citing Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987).

*Coals*, 946 F.2d at 1229. Conversion is defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Nelson & Witt v. Texas Co.*, 256 Mich. 65, 70, 239 N.W. 289 (1931), *cited in Citizens Ins. Co. of Amer. v. Delcamp Truck Ctr. Inc.*, 178 Mich.App. 570, 575, 444 N.W.2d 210 (1989). The Sixth Circuit noted that conversion is defined as "the unauthorized and wrongful exercise of dominion and control over another's personal property, to [the] exclusion of or inconsistent with [the] rights of [the] owner." *Vulcan Coals*, 946 F.2d at 1228.

■ The bankruptcy court found that the Seller had a security interest in the property which was sold by Debtor. (Tr. of Jan. 21, 1994 Proceedings at 8.) Whether the Purchase and Security Agreements provided Seller with a security interest in the merchandise sold by Debtor requires an interpretation of the contract terms and therefore is a question of law. *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1003 (6th Cir. (Mich.) 1993); *Bullock v. Automobile Club of Mich.*, 432 Mich. 472, 507, 444 N.W.2d 114 (1989). This court reviews a bankruptcy court's findings of law under the *de novo* standard. *In re American Mariner*, 734 F.2d at 429.

■ In the instant case, the Security Agreement provides that

[St. Anne Group] has ... full title to the collateral free and clear from any lien, security interest, encumbrance, or claim, with the exception of those specifically set forth herein.

Security Agreement at 1. The security interests "specifically set forth" in the Security Agreement provide as follows:

[St. Anne Group] may sell, contract to sell, lease, encumber or otherwise dispose of the collateral or any interest in it under this Agreement, *provided however, the Secured Party shall have a floating secured interest on all other equipment and inven-tory acquired by the Debtor and used in its principal place of business* until said obligation evidenced by the Promissory Note is paid in full.

Security Agreement at 2. Seller claimed that this language imposed on St. Anne Group ("St. Anne") an obligation to replace any collateral sold.[5] The terms of the Security Agreement, however, clearly do not include a requirement that St. Anne replace merchandise sold with new merchandise, no less with new merchandise of identical value. Rather, the Security Agreement provides that any merchandise which St. Anne does acquire *and* use in its principal place of business would also become subject to the "floating secured interest."

■ Conversion requires that the Debtor have exercised unauthorized and wrongful "dominion and control over *another's* personal property, to [the] exclusion of or inconsistent with [the] rights of [the] owner." *Vulcan*, 946 at 1228 (emphasis added). In the instant case, St. Anne's sale of some of its merchandise was consistent with its rights in the property, as those rights are defined by the Security Agreement. This court finds, therefore, that the bankruptcy court erred in holding that Debtor sold property that was subject to Seller's security interest.

■ The bankruptcy court found that Debtor's decision to downsize the inventory and conduct the sale was "a reasonable business decision for him to make." Tr. from Jan. 21, 1994 Proceedings at 8. The bankruptcy court's ultimate ruling of nondischargeability was based upon the finding that it was "malicious on the Debtor's part to sell the property, not replace it, and not pay or remit the proceeds to the [Seller] but rather to use them as he did." *Id.* at 9. Because this court finds that Seller did not have a security interest in merchandise sold by Debtor, the court also finds no obligation on Debtor's part to remit the proceeds of the sale to the Seller. Moreover, no specific

---

5. In fact, Debtor did replace some of the merchandise sold with new merchandise that occupied less space. Replacing all of the merchandise with duplicates of what was sold, however, would have defeated Debtor's purpose in selling the merchandise which, as discussed *supra*, was to reduce the amount of space occupied by the merchandise to accommodate the reduction in showroom space.

obligation to remit the proceeds of a sale of merchandise is found in the language of either the Purchase Agreement or the Security Agreement.

For the foregoing reasons, this court finds that Debtor did not commit a willful and malicious injury to the interests of Seller. Accordingly, Debtor's debt to Plaintiff shall be discharged.

■■ Although this court's holding, *supra*, renders moot the issue of damages, the court also notes that the bankruptcy court's rulings with respect to the amount of damages is clearly erroneous. In its order entering judgment in Seller's favor, dated January 24, 1991, the bankruptcy court directed the parties to file briefs on the issue of damages within thirty days. On March 1, 1994, the bankruptcy court entered a stipulated order permitting Debtor's attorneys, Sharon Truske, Jeffrey Mayer and the law firm of MacDonald & Goren, P.C., to withdraw from representation of Debtor. On March 1, 1994, per the bankruptcy court's January 24, 1994 order, Seller filed a brief on the issue of damages. Debtor, proceeding *pro. per.*, filed a brief on the issue of damages on March 2, 1994. In Debtor's brief, Debtor denies personal liability for the debts of his corporation St. Anne Group, and further states, *inter alia*, that

> I asked my former attorneys to release their file to me, but they have refused. Accordingly, I hereby reserve the right to supplement this Memorandum of Law upon receipt of Plaintiff's Memorandum and my file.

Debtor's Memorandum of Law at 2. The bankruptcy court nevertheless entered a "Final Judgment" on damages on March 7, 1994,[6] awarding Seller $69,655.46. This court finds that the bankruptcy court erred in proceeding on the damages issue prior to Debtor having an opportunity to review his file held by his former law firm and prior to his having an opportunity to find new counsel, if he so chose. As a matter of fairness, courts generally grant a party whose counsel has withdrawn an allotment of time within which to hire new counsel. *See e.g. Brookins v. General Motors Corp.*, 843 F.2d 879 (6th Cir.1987); *and see Gibbs v. Lappies*, 828 F.Supp. 6 (D.N.H.1993) (court refuses to allow withdrawal of attorney for client's non-payment of fees where withdrawal would prejudice interests of client). In the instant case, as in the *Gibbs v. Lappies* case, cited *supra*, Debtor did not stipulate to his counsel's dismissal. Rather, counsel for Debtor simply alleged that they had not been paid and that Debtor had discharged them, and plaintiff's counsel stipulated to opposing counsel's withdrawal. In the instant case, Debtor was clearly prejudiced by his lack of counsel.

The court further finds that the bankruptcy court's factual determination as to the amount of damages is clearly erroneous in light of the evidence presented by the parties. "A finding is clearly erroneous when, although there is evidence to support it, a reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemen*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948), *cited in In re H.J. Sheirich Co.*, 982 F.2d 945, 948 (6th Cir. 1993).

In the damages brief submitted to the bankruptcy court, Seller calculated its damages as follows: Seller claimed that, despite the valuation of the assets set forth in the Purchase Agreement, the Seller's actual cost of purchasing the inventory and fixtures found in the showroom at the time of the sale of the business was $66,685.13 in inventory and $42,445.00 in fixtures; therefore, Seller claimed that it had transferred to Debtor a total of $109,130.13 [sic][7] in assets. Seller next claimed that the total value of the inventory upon Seller's repossession of the inven-

---

6. March 2, 1994 fell on a Wednesday. March 7, 1994 fell on a Monday. Thus, Debtor was given no opportunity by the bankruptcy court to file an amendment to his pleading on the damages issue.

7. The amount of $66,685.13 added to 42,455.00 equals $109,140.13 and not $109,130.13.

tory was only $17,074.67, which is approximately one-third of the $51,225.00 agreed upon by the parties.[8] The Seller arrives at a final damages figure of $69,655.46 by subtracting from $109,130.13, the Debtor's $20,000.00 down payment, two monthly payments of $1,200 each[9] made by Debtor, and the $17,074.67 in inventory remaining in the store upon repossession.

▮ Not only is this calculation factually incorrect, that is, baseless in light of the evidence, but the method applied for the calculation of damages arising out of conversion, is flawed.[10] Where a debtor is found liable for conversion under 11 U.S.C. § 523(a)(6), the appropriate measure of damages is an amount equal to injury caused by the Debtor, rather than any other sum owed by the debtor. *In re Modicue*, 926 F.2d 452, 453 (5th Cir.1991). Only the value of the collateral at the time it was unlawfully sold by the Chapter 7 debtor is nondischargeable. *Id.* Damages in conversion actions depend upon the fair market value of the converted property. *In re Moore*, 87 B.R. 499, 503 (B.C.S.D.Ohio 1988). Damages in conversion actions are not measured by the face value of the security interest that was partially impaired by the conversion action. *In re Krause*, 44 B.R. 159 (B.C.W.D.Wis.1984). In the instant case, the collateral allegedly converted by sale on April 4 and 5, 1991, was sold for an approximate price of $15,000.00. No other evidence was submitted with respect to the fair market value of the items sold.

8. Seller apparently claimed that the inventory and fixtures value agreed upon by the parties on October 8, 1991 was a retail price and that calculation of the approximate cost, that is, the price paid to the manufacturer, is arrived at by dividing by three. In reviewing the October 8, 1991 inventory list, however, it is clear that the figure of $51,225.00 in fact is already based upon the wholesale cost of the inventory, and the agreed upon value of the fixtures (there is no basis for reducing the value of the fixtures by one-third). In the left hand column of figures is the retail price and in the right hand column is a handwritten cost price, the cost price being approximately one-third of each retail price. This court did its own addition of the figures in the right hand column, that is, the wholesale cost agreed upon by the parties, and those figures in fact add up to the $51,225.00 total indicated at the end of the inventory and fixtures list. Thus, Seller clearly repossessed from Debtor $51,-

## ORDER

Therefore, it is hereby **ORDERED** that Debtor's appeal is **GRANTED.**

It is further **ORDERED** that the findings of the bankruptcy court are hereby **REVERSED;** and

It is further **ORDERED** that Debtor's indebtedness to Seller is hereby **DISCHARGED.**

**SO ORDERED.**

225.00 in fixtures and inventory at wholesale cost.

9. Debtor claims that his monthly payments were in the amount of $972.00 each.

10. Even assuming that this were the proper *method* of calculating damages, the calculation itself is clearly erroneous. Under this method of analysis, a more appropriate calculation would have been as follows: Seller had a security interest in the merchandise and fixtures totalling $70,000, that is, the face value of the security note. Debtor paid on that $70,000.00, two payments in an amount of $972.00 each, and the inventory and fixtures turned over to Seller was agreed upon by the parties on October 8, 1991 totalling $51,225.169. Thus, the balance owing Seller, assuming the debt was not dischargeable, would have been, under this method of calculating damages, $16,831.00 and no more.