MID–OHIO CHEMICAL COMPANY, INC., Plaintiff,

v.

Dean PETRY, et al., Defendants.

No. C–3–91–214.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 29, 2000.

Robert E. Griffin, Robert G. Kennedy, Columbus, OH, for Plaintiff.

Augustus Littlejohn Ross, III, West Alexandria, OH, Patrick Quinn, Dayton, OH, for Defendants.

Dean Petry, Eaton, OH, Pro se.

DECISION AND ENTRY FINDING THAT FARMERS HOME ADMINISTRATION'S SUBORDINATION TO THE COMMODITY CREDIT CORPORATION GOES TO THE ENTIRE OVERALL BALANCE OWED TO FMHA BY PETRY; GOVERNMENT ENTITIES ARE ENTITLED TO THE ENTIRE VALUE OF PETRY'S 1989 CROPS; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS FARMERS HOME ADMINISTRATION AND COMMODITY CREDIT CORPORATION AND AGAINST PLAINTIFF; TERMINATION ENTRY.

RICE, Chief Judge.

This litigation arises out of the failure of a farmer, J. Dean Petry ("Petry"), to pay his debts. Plaintiff Mid–Ohio Chemical Company ("Mid–Ohio") and the United States both loaned money to Petry and took security interests in his 1989 crops. The United States loaned money to Mr. Petry through both the Farmers Home Administration ("FmHA"), an agency of the United States, and the Commodity Credit Corporation ("CCC"), a corporation wholly owned by the United States.

The parties have stipulated to the following facts. Since the early 1980s, FmHA has dispersed operating loans to Petry, a farmer with operations in and around Preble County, Ohio. FmHA took a security interest in various items of Petry's personal property and in his 1989

crops.[1] These loans were each perfected by the prompt and correct filing of UCC Financing Statements and timely Continuation Statements. Along with the financing statements and security agreements executed by Petry and FmHA, promissory notes were also executed, whereby Petry's indebtedness to FmHA was to be repaid in yearly installments.

Beginning in 1987 and continuing through 1989, Mid–Ohio provided crop inputs and fertilizer products to Petry. On October 18, 1989, Plaintiff filed a Uniform Commercial Code financing statement in Preble County, claiming a lien upon Petry's 1989 crops and the proceeds therefrom. On November 2, 1989, Petry signed a security agreement for Mid–Ohio, thereby perfecting Mid–Ohio's interest in those crops. Mid–Ohio was aware of FmHA's prior lien upon these same crops. At this time, Petry owed FmHA a total indebtedness of about $197,000, and he owed Mid–Ohio a total indebtedness of about $122,000.

Subsequent to the filing and the perfection of Mid–Ohio's security interest in Petry's 1989 crops, CCC disbursed two operating loans to Petry and took a security interest in the same crops. Loan number 36 was disbursed on November 15, 1989, in the amount of $19,730.75. Loan number 78 was disbursed to Petry on December 13, 1989, in the amount of $29,079.83. CCC performed lien searches prior to the disbursement of each loan; however, it

failed to discover Mid–Ohio's lien upon the 1989 crops. The checks issued by CCC were made payable to Petry and FmHA jointly.[2] Mid–Ohio was not named as a payee. FmHA had to sign the checks before Petry could negotiate them. FmHA signed off on the checks and Petry negotiated same.

In December, 1989, Petry made his annual payments to FmHA. On December 7, 1989, he delivered two checks to FmHA, in the amount of $4,000 and $1,311.73, respectively. On December 18, 1989, Petry issued two additional checks to FmHA, in the amounts of $980 and $13,370.27. In February, 1990, Petry repaid loan number 36 to CCC. Loan number 78 was repaid to CCC on April 11, 1990. These payments completely eliminated Petry's indebtedness to CCC, thus leaving the indebtedness to FmHA and Mid–Ohio.

According to the record, Plaintiff sold his 1989 crops to three grain dealers: Cargill, Consolidated Grain and Barge, and Lowell Shaffer Farms (Doc. # 53, Ex. 8). The total proceeds that he received from each were:

1) Lowell Shaffer Farms    $11,502.74;

2) Consolidated Grain and Barge    $ 1,648.36;

3) Cargill    $98,317.23.[3]

Thus, Petry received a total of $111,468.33 from these three dealers for his 1989 crop. On March 19, 1990, Petry received eight

---

1. According to Exhibit 10 of the Joint Exhibits (Doc. # 53), Petry and FmHA entered into four security agreements, the first dated June 16, 1983, the second dated January 18, 1984, the third dated May 20, 1986, and the fourth dated July 6, 1989. Under the 1989 agreement, the collateral consisted of Petry's crops and farm equipment, including the proceeds and products thereof.

2. This is standard practice of CCC, pursuant to a 1967 Memorandum of Understanding between CCC and FmHA.

3. In the Final Pretrial Order, the parties stipulated that Cargill paid $48,221.15 for Petry's 1989 grain. Plaintiff asserts that it recently became aware that a number of checks in its possession represented additional sales of grain. Because these "new" checks are included in the Joint Exhibits, the Court will consider them as part of Petry's total sales to Cargill.

checks from CCC, totaling $6,620.00, for 1989 crop deficiency payments. These checks were issued as part of the crop deficiency program, which was designed to encourage farmers to limit the amount of acreage they would plant. Plaintiff contends that Mr. Petry also received non-farm income for 1989, totaling $32,156.95.[4]

Mid–Ohio filed suit on May 17, 1991, against Petry, the United States (through FmHA and CCC), and John Doe, a negligent purchaser of Petry's crops,[5] setting forth four claims, to wit: 1) a claim against Petry for failure to pay on account crop proceeds secured by a valid security interest held by Mid–Ohio on his crops; 2) a claim against the United States, through CCC, due to its failure to include Plaintiff as a payee on purchase checks; 3) a claim against the United States for failure to include Plaintiff's name on a crop loan made to Petry through CCC; and 4) a claim against the United States, through CCC and FmHA, for conversion of crop proceeds from Petry's 1989 crops (Doc. # 1). In April of 1992, Petry filed a petition for bankruptcy. As a consequence, he was severed from this action on October 8, 1992 (Doc. # 30). In July, 1992, Plaintiff filed a motion for summary judgment against the United States (Doc. # 27). The Court overruled that motion on December 30, 1993 (Doc. # 33). On January 26, 1998, Plaintiff informed the Court that Petry had completed his Chapter 12 Plan and that his bankruptcy estate had been closed (Doc. # 58). Plaintiff further indicated that Mr. Petry had signed waiver of discharge for his debt to Mid–Ohio (Doc. # 52, Ex. A). Thus, his indebtedness to Plaintiff, in the amount of $81,000, was not discharged under the Bankruptcy Code. Mid–Ohio requested that the Court grant summary judgment against Petry and award it $81,000, plus interest and costs (id.). The Court sustained that motion for summary judgment on September 15, 1998 (Doc. # 62). Judgment was entered in favor of Plaintiff and against Defendant Petry on September 10, 1999, the Court having expressly directed same, having concluded that there existed no just reason for delay, pursuant to Fed.R.Civ.P. 54(b) (Doc. # 64).

With regard to the government, the parties have agreed to forego a trial, and instead to submit the case upon briefs and stipulated facts. The Court agreed and entered an order to that effect (Doc. # 47). In its brief, Plaintiff has dismissed Counts Two and Three (Doc. # 52 at 8–9). Accordingly, the only remaining claim against the United States is Count IV, a claim against the United States, through CCC and FmHA, for conversion of crop proceeds from Petry's 1989 crops. The Court has reviewed the briefs, the evidence of record, the stipulated facts, and the applicable law. As a means of analysis the Court will first summarize the priority rights of the parties, as discussed in prior rulings, and then set forth the issues to be decided by the Court. The Court will then turn to its analysis of those issues. For the reasons assigned, the Court finds in favor of FmHA and CCC and against Plaintiff.

## I. Priority of the Parties' Liens

Although not among the stipulated facts, the parties appear to agree that, absent a subordination agreement between FmHA and CCC, FmHA's lien had first priority, Mid–Ohio's lien had second priority, and CCC's lien had third priority. However,

---

4. This non-farm income consists of 1990 crop deficiency payments, interest income, rental income, and Mr. Petry's wages from the local school district.

5. No "John Doe" has been identified.

the parties all acknowledge that FmHA and CCC entered into a subordination agreement, which provided that FmHA's security interest "shall be subordinated to the rights of CCC in the commodity with respect to which the loan or purchase is made. The word 'subordinated' means that, in the case of a loan, CCC's security interest in the commodity shall be superior and prior in right to that of [FmHA]". (Doc. # 29, Ex. A). In addressing Plaintiff's Motion for Summary Judgment (Doc. # 27), the Court evaluated the effect of that agreement on the priority rights of the parties. Following the reasoning of the Texas Supreme Court in *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803 (Texas 1987), this Court concluded that FmHA did not waive its top priority as first lienholder in favor of Mid–Ohio's lien. It stated, in pertinent part:

> ... Mr. Petry owed approximately $197,000 to FmHA and only about $50,000 to the CCC. Mid–Ohio could have no expectation of having a secured interest in the first $197,000 of the crop proceeds. If, in fact, FmHA chose to subordinate $50,000 of that $197,000 interest to the CCC, such a decision would have caused no change whatsoever in Mid–Ohio's position. As long as Mr. Petry's repayments to FmHA and the CCC combined did not exceed the total FmHA interest secured by the collateral, and there is no indication in the record that they did, Mid–Ohio would not have been deprived of any interest to which it was lawfully entitled.

(Doc. # 33 at 13–14).

## II. *Issues Remaining*

In the parties' Final Pretrial Order (Doc. # 46), they set forth six remaining questions of law for the Court to resolve, to wit:

1) Does the secured interest of FmHA extend to the entirety of farmer Petry's 1989 grain crop or only so much of it as is equal to the amount of annual instalment [sic] payment required under the Promissory Notes he entered into with Farmers Home? ($21,936.00[,] stipulation 5)

2) If the answer to the first question is that the FmHA security interest extends to the entire crop, then the Court must determine if the value of farmer Petry's 1989 grain crop exceeded the total of the debt he owed FmHA at that time; $197,000. If not[,] then the Government is entitled to the totality of the funds given it by farmer Petry and Mid–Ohio must pursue some other course of action to recover its funds.

3) If the answer to the first question is that FmHA's first lien position extends only to the annual installment payment[,] then the Court must determine, in accordance with its decision on Plaintiff's Motion for Summary Judgment, how much if any of the money paid to CCC by Petry actually belongs to Mid–Ohio . . . .

4) Included within the 3rd question is the question of which of the parties has the burden of proving whether or not the funds paid to FmHA and/or CCC in fact had their origin in the sale of Mr. Petry's 1989 grain.

5) Was FmHA entitled to receive its $21,936.00 in payments (received in December of 1989) ahead of Mid–Ohio in light of [FmHA's] subordination to CCC?

6) Does [Petry's] payment of [his]1989 annual installment payment [to FmHA] (with mostly CCC funds) have any effect on FmHA's right to subordinate its right to this payment to a junior creditor? i.e. Can CCC step into FmHA's position for the amount of the annual installment payment ($21,936) with or without the approval of all senior lien

holders or; does FmHA's subordination become moot [*i.e.,* irrelevant] since it was paid its annual installment payment and therefore has no interest to subordinate to CCC?

As discussed below, the Court concludes that FmHA's secured interest extends to the entirety of Petry's 1989 grain crop. As a result of this conclusion, the Court finds in favor of the government on all of the remaining issues of law. In addition, the Court need not determine whether the proceeds from Petry's 1989 crops were used to pay off Petry's indebtedness to FmHA.

### III. *Analysis*

■ Plaintiff argues that while FmHA held a secured interest in Mr. Petry's crops and equipment, that interest was limited to a payment of $21,936.00 per year by the installment agreement set forth in the promissory notes (Doc. # 52 at 15). In Plaintiff's words,

> ... as long as Petry made these minimum payments, by the terms of the agreements, Petry was entitled to do whatever he wanted to do with any remaining proceeds ... Absent a default of the promissory note or security agreement, FmHA had no right to require Petry to pay more than the agreed to yearly installment amount. Petry was then free to use any remaining crop proceeds over and above the required annual installment payment of $21,936.00 in just about any manner he saw fit.

*Id.* at 15–16. Thus, Plaintiff asserts that once Mr. Petry made his annual payment in 1989, FmHA no longer had any interest in Petry's 1989 crops.

In support of its position, Plaintiff focuses on the default provision in the promissory notes, which states:

> DEFAULT: Failure to pay when due any debt evidenced hereby or perform

any covenant of agreement hereunder shall constitute default under this and any other instrument evidencing a debt of Borrower owing to, insured or Guaranteed by the Government or securing or otherwise relating to such debt; and default under any such other instrument shall constitute default hereunder. UPON ANY SUCH DEFAULT, the Government at its option may declare all or any part of any such indebtedness immediately due and payable.

Plaintiff also cites to Part IV(K) of the security agreement, which provides, "SECURED PARTY HAS INFORMED DEBTOR THAT DISPOSAL OF PROPERTY COVERED BY THIS SECURITY AGREEMENT WITHOUT THE CONSENT OF SECURED PARTY, OR MAKING ANY FALSE STATEMENT IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, MAY CONSTITUTE A VIOLATION OF FEDERAL CRIMINAL LAW." Mid–Ohio contends that, reading the security agreements and the promissory notes together, the language does not state that any "disposal" of property covered by the security agreement creates a default in that agreement. Because no default occurred, Mid–Ohio argues, FmHA was only entitled to receive a minimum annual installment payment from Mr. Petry.

Whether the security agreements and promissory notes provide FmHA with a security interest in the entirety of Mr. Petry's 1989 crops requires an interpretation of the contract terms. *Bonfiglio v. Harkema Assoc., Inc.,* 171 B.R. 245, 249 (E.D.Mich.1994), *aff'd* 82 F.3d 417 (6th Cir. 1996). Upon review of the record, Plaintiff's argument is refuted by the terms of the security agreements between Mr. Petry and FmHA. The Security Agreement does not limit the collateral to only the value of the annual payment. As discussed by the government, the first page

of each of the security agreements states, in pertinent part:

... Debtor is justly indebted to Secured Party as evidenced by one or more certain promissory note(s) or other instrument(s), and in the future may incur additional indebtedness to Secured Party which will also be evidenced by one or more promissory note(s) or other instrument(s), all of which are called "note", which has been executed by Debtor, is payable to the order of Secured Party, and authorizes acceleration of the entire indebtedness at the option of Secured Party upon any default by Debtor; and ...

... in consideration of said loan(s) ...

DEBTOR GRANTS to Secured Party a security interest in Debtor's interest in the following collateral, *including the proceeds and products thereof:*

Item 1. All crops, annual and perennial, and other plant products now planted, growing or grown, or which are planted after this instrument is signed or otherwise become growing crops or other plant products ... on the following described real estate:....

(Joint Exhibit 10 at 1, 4, 8, 12) (emphasis added).[6] In addition, the 1983, 1986, and 1989 security agreements included as collateral, in addition to crops, "all farm and other equipment ... and inventory, now owned or hereafter acquired by Debtor, together with all replacements, substitutions, additions, and accessions thereto...." (Joint Ex. 10, item 2). According to this language, FmHA obtained a security interest in all of Mr. Petry's 1989 crops, not a portion of those crops, as well as his farming equipment. Moreover, the agreements provide that upon sale of the collateral, FmHA retained a security interest in the proceeds. Accordingly, the language of

the security agreements provide that, upon sale of the 1989 crops, FmHA retained a security interest in the cash proceeds.

Mid–Ohio argues that because Petry was not in default, he could apply the proceeds from the sale of the 1989 crop to other secured liens on his crop (or to anything else, for that matter). While Mid–Ohio focuses on the default provisions, the security agreements further provide that Mr. Petry must apply the proceeds from disposition of the collateral to its FmHA debt. They state, in pertinent part:

C. Proceeds from disposition of collateral shall be applied first on expenses of retaking, holding, preparing for sale, selling and the like and for payment of reasonable attorneys' fees and legal expenses incurred by Secured Party, second to the satisfaction of prior security interests or liens to the extent required by law and in accordance with current regulations of the Farmers Home Administration, third to the satisfaction of indebtedness secured by this instrument, fourth to the satisfaction of subordinate security interests to the extent required by law, fifth to any other obligations of Debtor owing to or insured by Secured Party, and sixth to Debtor. Any proceeds collected under insurance policies shall be applied first on advances and expenditures made by Secured Party, with interest, as provided above, second on the debt evidenced by the note, unless Secured Party consents in writing to their use by Debtor under Secured Party's direction for repair or replacement of the collateral, third on any other obligation of Debtor owing to or insured by Secured Party, and any balance shall be paid to Debtor unless otherwise provided in the insurance poli-

---

**6.** Although the four security agreements are not identical, the substance of the agreements is the same.

cies. Debtor will be liable for any deficiency owed to Secured Party after such disposition of proceeds of the collateral and insurance.

(Jt.Ex.10, Art. IV(C)).[7] Thus, reading the security agreements and promissory notes together, the language of those documents clearly and unambiguously indicate that, provided that Mr. Petry was not in default and that he did not dispose of the collateral, he was required only to pay FmHA an annual installment, namely $21,936. If, on the other hand, Mr. Petry were to dispose of collateral, i.e., were he to sell the 1989 crops, Mr. Petry was required to use the proceeds of the sale to pay his indebtedness, in accordance with the applicable phrases or steps of Part IV(C). Contrary to Plaintiff's assertions, under that provision, Mr. Petry was required to use the proceeds to pay his entire indebtedness to FmHA before he could use the proceeds for other purposes, such as to pay Plaintiff on its junior or subordinate liens. In other words, the presence of default or not is immaterial; the triggering event was the disposition (i.e., sale) of the crop. Accordingly, the Court concludes that FmHA's secured interest extends to the entirety of Mr. Petry's 1989 crop. The fact that the promissory notes between FmHA and Mr. Petry required the debtor to pay his debt in annual installments did not limit FmHA's secured interest to the amount of that payment. The Court further concludes that, upon sale of the 1989 crop, Mr. Petry was required to use the proceeds to repay the liens in order of priority. In other words, pursuant to the terms of the subordination agreement and in accordance with this Court's ruling on Plaintiff's

motion for summary judgment (Doc. # 33), payment of the liens would occur as follows:

1. CCC ($48,810.58). Because Petry's indebtedness to CCC was less than his indebtedness to FmHA, the entire value of CCC's loan is given first priority due to the subordination agreement between CCC and FmHA (see Doc. # 33).

2. FmHA, to the extent that its loan exceeded the indebtedness to CCC (i.e., $197,000 minus $48,810.58 = $148,189.42)

3. Mid–Ohio ($122,000)

4. FmHA ($48,810.58, representing the remaining value of its loan to Petry that it subordinated under its agreement with CCC)

■ In its reply memorandum (Doc. # 55), Plaintiff argues that the subordination agreement between FmHA and CCC was nullified, due to the fact that FmHA received its annual installment from Mr. Petry prior to CCC or Mid–Ohio receiving any payment. The Court disagrees. Because FmHA was initially (prior to the subordination agreement) entitled to receive $197,000, prior to either Mid–Ohio or CCC receiving payment, the fact that FmHA received its annual payment had no actual impact on the amount of CCC's loan to Mr. Petry that could be elevated in priority. If such an impact were to have occurred, it would have been CCC, not Plaintiff, which would have suffered an injury. Neither Plaintiff's priority nor the amounts that FmHA and CCC were entitled to receive prior to Plaintiff receiving

---

**7.** Although the first part of this provision appears to be applicable only where the collateral is disposed of due to the debtor's default, the language does not limit the provision to that situation. That language is not a subpart of Parts IV(A) and (B), which discuss default. In addition, the lettered subparts of Part IV

cover a variety of topics, only one of which is default. The Court therefore interprets Part IV(C) as applying to all dispositions of collateral. Where the disposition is done by a debtor who is not in default, the proceeds are applied according to the applicable phrases or steps of Part IV(C).

payment was affected by the timing of the annual payment to FmHA.

Mid–Ohio acknowledges that the value of Mr. Petry's 1989 crops does not exceed $197,000. Accordingly, the government entities are entitled to the entire value of Petry's 1989 crops. Mid–Ohio must pursue another course of action to recover its funds.

Judgment will enter in favor of Defendants FmHA and CCC and against the Plaintiff, dismissing the captioned cause, with prejudice.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.